## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| JOYCE M. KING, | |
| Plaintiff, | |
| v. | Civil Action No. TDC-14-2752 |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff Joyce M. King slipped and fell on a greasy substance while riding an escalator at the Capitol Heights Metro Station in Capitol Heights, Maryland. Presently pending are a Motion for Summary Judgment and a Motion to Strike, both filed by Defendant Washington Metropolitan Area Transit Authority ("WMATA"). The Motions are fully briefed and ripe for disposition, and no hearing is necessary to resolve them. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion to Strike is DENIED, and the Motion for Summary Judgment is GRANTED.

## BACKGROUND

The following facts are either undisputed or presented in the light most favorable to the nonmoving party.

### I.      Escalators at the Capitol Heights Metro Station

The Capitol Heights Metro Station has three levels, listed as follows in descending order: the street level; the mezzanine level, where passengers purchase fare cards; and the platform level, where the trains run. There are a total of five escalators in the station. Escalators One and

Two ascend from the mezzanine level to the street level. Escalator Three descends from the street level to the mezzanine level. Escalators Four and Five run between the mezzanine and platform levels.

At 4:42 a.m. on December 5, 2013, the day of the accident, Capitol Heights Station Manager Paul Hill arrived at work. As usual, Hill first went to the kiosk on the mezzanine level to call Central Control and the Division Clerk and let them know he was on duty. He then proceeded to conduct a station check to prepare the station for opening. The steps to be followed during a station check are set forth in WMATA standard operating procedures on which Hill had been trained.

As part of the station check, Hill first looked over the escalator logbook to see if any of the escalators had a problem the night before or should not be turned on. If something was wrong with an escalator, the logbook would indicate which one and the reason. That day, the logbook indicated that all escalators were in service. Hill then descended to the platform level to turn on Escalators Four and Five. After walking the length of the platform to check the train tracks for debris, Hill walked back up one of the escalators to the mezzanine level. While walking up the escalator, Hill followed the standard operating procedure, which required him to determine if anything is out of the ordinary, such as misaligned steps, missing comb teeth, a loose handrail, or an item dropped on the escalator. After conducting other checks on the mezzanine level, Hill turned on the remaining escalators and walked up Escalators One and Two and down Escalator Three, performing the same safety check. Finally, he returned to the kiosk, turned on the elevator, and opened the station sometime before 5:02 a.m.

2

From about 6:00 to 9:30 a.m., during rush hour, Hill walked around the mezzanine level to be available to assist passengers. At one point, Hill went on a break and left the station. He returned at 9:00 a.m. by descending Escalator Three.

The station manager who relieved Hill during his break performed a station check at 8:30 a.m. In her Station Condition Checklist, the second station manager crossed off a box indicating that the escalators were in good condition. Under the column entitled "List of Equipment/Problem/Failure of Ticket Number," she left the space next to "escalators" blank. Def.'s Reply Pl.'s Opp'n Mot. Summ. J. Ex. 5, Station Condition Checklist.

Between 9:30 a.m. and 12:00 noon, Hill generally stayed in the kiosk, but he performed periodic checks, approximately hourly, by walking the platform and station, focusing primarily on the mezzanine and platform levels.

## II.    The Accident

On December 5, 2013, King was scheduled to start work at her office in Washington, D.C. at 12:30 p.m. Sometime between 11:30 and 11:55 a.m., King's husband dropped her off at the Capitol Heights Metro Station's "Kiss and Ride" area on the street level. Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), King Dep. at 35. King then rode down Escalator Three toward the mezzanine level. When she got on the escalator, she noticed nothing unusual about the way it was operating. Part of the way down, King decided that she was going to walk the rest of the way. As she took a step with her right foot, her foot slipped and flew out from under her. She fell onto her left hip area. When she attempted to get up, her shoes kept sliding. She turned over to try to stand up, but to no avail; her feet continued to slip on a greasy, oily substance.

Near the bottom of the escalator, King was able to return to her feet. Holding onto the railing, she stepped off the escalator once she hit the metal landing plate. She noticed that on the

3

landing plate there were many footprints of people's shoes in different sizes and shapes. She then walked over to the kiosk and told Hill that she had slipped on something oily, fell, and that her leg was "burning." *Id.* at 51–56; Pl.'s Opp'n, Hill Dep. at 57. King then pulled up the side of her pants and realized that her leg was bleeding. She also had skin gouged out of her left ankle. King also noticed that there were greasy marks on her light, ivory pants.

After the accident, WMATA conducted service of Escalator Three the same day. According to WMATA Assistant General Superintendent Mitch Nici, who has worked in WMATA's Elevator and Escalator Division since 1994 and has training in escalator operations and maintenance, the results of that service revealed no malfunction, condition, or defect that would have caused a greasy or oily substance to be present on the steps that day. He also stated that, after having reviewed the inspection, maintenance, and service records for Escalator Three covering the 12-month period prior to the incident, there was no record of malfunction, condition, or defect that would have caused such a substance to appear.

On May 30, 2014, King filed her Complaint in the Circuit Court for Prince George's County, Maryland in which she asserted a cause of action for negligence, claiming that WMATA negligently maintained the escalator and operated it in a dangerous and reckless fashion. She seeks $500,000 in damages plus costs and attorney's fees. On August 27, 2014, WMATA filed its Notice of Removal pursuant to the WMATA Compact, Md. Code Ann., Transp. § 10-204.81 (2010). Following discovery, WMATA filed its Motion for Summary Judgment on July 24, 2015.

## DISCUSSION

### I.    Motion to Strike

After WMATA filed the Motion for Summary Judgment, King was instructed through the Court's Case Management/Electronic Case Files system that she had until August 10, 2015 to file a response.  However, King did not file a response until September 4, 2015, when she filed her Opposition to Defendant's Motion for Summary Judgment ("Opposition").  The following day, WMATA filed a Motion to Strike King's Opposition, arguing that she did not seek the Court's leave to file an untimely response or provide an explanation.  The Court generally does not consider a submission filed after a deadline if not accompanied by a motion to enlarge the time for filing. *See* Fed. R. Civ. P. 6(b)(1)(B).  In addition, for the Court to excuse a late filing, the moving party must show "excusable neglect." *See id.*  In assessing excusable neglect, courts consider the danger of prejudice to the other party, the length of delay and its potential impact on judicial proceedings, the reason for the delay, and whether the movant acted in good faith. *See Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 533 (4th Cir. 1996).  Here, King has provided no valid explanation for the late filing.  The Court ordinarily would strike King's Opposition on this basis.  In this instance, however, as set forth below, acceptance and consideration of the Opposition will not in any way prejudice WMATA on the Motion for Summary Judgment.  Accordingly, the Court will deny the Motion to Strike.

### II.    Motion for Summary Judgment

#### A.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court may rely only on facts supported in the record, not simply assertions in the pleadings.  *Felty v. Grave–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  "A material fact is one that might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted).  A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

Because the alleged tort and resulting injury occurred in Maryland, the Court applies Maryland law.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Branhaven, LLC v. BeefTek, Inc.*, 965 F. Supp. 2d 650, 664 (D. Md. 2013) ("When a claim is based on state law, the choice of law rules are those of the state in which the district court sits."); *Lab. Corp. of America v. Hood*, 911 A.2d 841, 845 (Md. 2006) (holding that in a tort action, Maryland applies the law of the state where the injury occurred).

**B.    Duty of Care**

In Maryland, the standard of care that an owner or occupier of land owes to those who enter onto the property varies according to the visitor's status as a business invitee, a licensee by invitation, a bare licensee, or a trespasser.  *Wagner v. Doehring*, 553 A.2d 684, 686 (Md. 1989); *Tennant v. Shoppers Food Warehouse Md. Corp.*, 693 A.2d 370, 374 (Md. Ct. Spec. App. 1997).

An "invitee" is defined as "one invited or permitted to remain on the premises for purposes related to the owner's business." *Wagner*, 553 A.2d at 686; *Tennant*, 693 A.2d. at 374. King entered the Capitol Heights station to ride the Metro, so there is no doubt that she was a business invitee.

Businesses owe their customers a duty of ordinary care to maintain their premises in reasonably safe condition. *Moulden v. Greenbelt Consumer Servs., Inc.*, 210 A.2d 724, 725 (Md. 1965); *Rawls v. Hochschild, Kohn & Co.*, 113 A.2d 405, 407 (Md. 1955). Here, WMATA does not contest that it owed this duty of care to King. The question, therefore, is whether WMATA was negligent by failing to meet this standard of care.

### C.    Breach of the Duty

If a business breaches its duty of care, it is liable for a customer's resulting injuries. *Moulden*, 210 A.2d at 725. However, the fact that a customer was injured on the business's premises does not create a presumption of negligence; the customer must show that the business's negligence produced the injury. *Rawls*, 113 A.2d at 408. "A mere surmise that there may have been negligence will not justify the court in permitting the case to go to the jury." *Moulden*, 210 A.2d at 726. To establish negligence arising from a slip and fall caused by a dangerous condition on the premises, a customer must demonstrate either that the business "created the dangerous condition" or that it "had actual or constructive knowledge of its existence." *Rawls*, 113 A.2d at 408.

### 1.    Creating the Dangerous Condition

If there is evidence that a WMATA employee was responsible for causing the greasy substance to appear on the escalator, there likely would be sufficient evidence to preclude summary judgment. *See Moore v. American Stores Company*, 182 A. 436, 440 (Md. 1936)

(reversing a directed verdict in favor of a grocery store in a slip-and-fall case, where the plaintiff had slipped on bacon or grease near the meat counter, and the proximity to the meat counter supported a reasonable inference that the grease was caused by "the careless dropping of similar greasy substances" by the grocery store's meat counter employees).   However, King has identified no evidence to support a finding that WMATA or its employees directly caused the presence of the greasy substance on the escalator.  In fact, the only evidence on the subject shows that WMATA was not responsible for the grease.  WMATA has offered evidence, through Assistant General Superintendent Nici, that the inspection and servicing of the escalator immediately following the accident, as well as the maintenance records from the 12 months prior to the accident, revealed "no malfunction, condition or defect that would have caused a greasy or oily substance to be present on the escalator steps on December 5, 2013."  Def.'s Mot. Summ. J. Ex. 2, Nici Aff. ¶¶ 6–7.  King has offered no contradictory evidence on this point.  Likewise, there is no evidence that Hill or any other WMATA employee had caused the grease to be present on the escalator.  Thus, King cannot establish a breach of the duty of care based on WMATA having created the dangerous condition.

### 2.    Actual or Constructive Knowledge

Because there is no evidence that WMATA or any of its employees had actual knowledge of the greasy substance prior to the accident, King must present sufficient evidence to support a finding that WMATA had constructive knowledge of its existence.  To show constructive knowledge, an invitee must show that "the condition existed for a length of time sufficient to permit a person under a duty to discover it if he had exercised ordinary care."  *Rawls*, 113 A.2d at 409.  "What will amount to sufficient time depends upon the circumstances of the particular case, and involves consideration of the nature of the danger, the number of persons likely to be

affected by it, the diligence required to discover or prevent it, opportunities and means of knowledge, the foresight which a person of ordinary care and prudence would be expected to exercise under the circumstances, and the foreseeable consequences of the conditions." *Moore*, 182 A. at 440.

In similar slip-and-fall cases in business settings, Maryland courts have found that summary judgment or its equivalent is warranted if there is no evidence to show how the dangerous substance came to be present, even if it was present for a few hours. In *Montgomery Ward & Co. v. Hairston*, 78 A.2d 190 (Md. 1951), a department store customer slipped and fell on stairs on which there was an "oily, greenish, grayish substance." *Id.* at 190. There was no evidence on how or when the substance got there, but the store presented evidence that the store had been mopped before opening and once during the morning at an unspecified time, before the plaintiff slipped and fell at 12:30 p.m. *Id.* The court held that the evidence did not support a finding of constructive notice, because "there was nothing to charge the defendant with notice of the spot." *Id.* at 191. *See also Rawls*, 113 A.2d at 410 (affirming judgment notwithstanding the verdict where a customer slipped on water on stairs inside a department store, but "there was no evidence to indicate how [the water] had been brought there or how long it had been there").

In *Lexington Market Authority v. Zappala*, 197 A.2d 147 (Md. 1964), where a woman who fell in a parking lot on oil or grease that had been present no more than two hours, the court found no evidence of constructive notice because it would be "unreasonable" to find a duty "to continuously inspect and sand down any leakage as soon as it occurs, even if we assume that periodic inspections are necessary." *Id.* at 148.

In *Moulden v. Greenbelt Consumer Services, Inc.*, 210 A.2d 724 (Md. 1965), a supermarket customer slipped on a six-inch, mashed green string bean and argued that based on

its discoloration, it must have been present for a lengthy period of time. *Id.* at 725–26. Where the supermarket established, based on the regular cleaning schedule and testimony from a manager that he had examined the aisle sometime after the last cleaning, that the green bean had been present no more than two and a half hours, the court upheld a directed verdict for the supermarket because the evidence was insufficient to establish constructive notice. *Id.* at 726 ("[I]t would be unreasonable to hold that it is [the supermarket's] duty to conduct a continuous inspection tour of the store.").

In *Maans v. Giant of Maryland, LLC*, 871 A.2d 627 (Md. Ct. Spec. App. 2005), a supermarket customer slipped and fell on water on the floor of the store, and the supermarket offered testimony that all of its employees were charged with looking for spills and other hazards, but it was unable to establish the last time the floor had been actually been cleaned or inspected. *Id.* at 629, 633–34. Nevertheless, the court found that the customer had failed to meet her burden to establish evidence of constructive knowledge because she did not show how the water got on the floor or that it was there long enough that the supermarket should have discovered it prior to the accident. *Id.* at 633–35.

These cases collectively establish that in Maryland, where there is no evidence of when or how a hazardous substance came to be present, constructive knowledge generally has not been established. *See, e.g.*, *Rawls*, 113 A.2d at 410; *Maans*, 871 A.2d at 633–35. This is particularly true when there is evidence that limits the amount of time the substance was present to less than a few hours. *See, e.g.*, *Montgomery Ward*, 78 A.2d at 190 (stairs mopped at store opening and at an unknown time during the morning before the accident occurred at 12:30); *Moulden*, 210 A.2d at 725–26 (no more than two and a half hours); *Lexington Market Authority*, 197 A.2d at 148 (no more than two hours). Here, there is no evidence to show how or specifically when the greasy

10

substance got onto the escalator. The evidence establishes that Escalator Three was inspected twice the morning of the accident: once by Hill between 4:42 and 5:02 a.m. and once by another station manager at 8:30 a.m. Hill also walked down the escalator at 9:00 a.m. when he returned from his break. Therefore, less than three hours elapsed between the last observation of the escalator by WMATA staff and King's fall between 11:30 and 11:55 a.m., in the same range as the time period that the *Montgomery Ward* and *Moulden* courts found insufficient to put the stores on constructive notice of the hazard. *Montgomery Ward*, 78 A.2d at 190; *Moulden*, 210 A.2d at 726. Although the nature of the danger on escalator may exceed that of a staircase, and the volume of traffic in a Metro station may be more significant than in some of the settings at issue in these cases, *see Moore*, 182 A. at 440, the Court finds this body of law to be sufficiently comparable to conclude that King has not established constructive notice under the present facts.

King argues that the number of footprints imprinted onto the landing pad demonstrates that there was a long period of time between when the grease appeared and when she fell. However, just as in *Moulden*, where the discolored and smashed up green bean was insufficient to prove that it was on the floor long enough to establish constructive notice, the footprint evidence is insufficient to show that the greasy substance was on the escalator for an unreasonably lengthy period of time. *See Moulden*, 210 A.2d at 725–26. King has not provided evidence on the number of different footprints or how that number would only be consistent with the volume of passengers during rush hour or over a long period of time. Particularly where there is evidence that the station manager walked the escalator at 9:00 a.m. and did not encounter the greasy substance, the number of footprints does not establish that the greasy substance was present for six or more hours, as King suggests. Without more, King has not raised a genuine issue of material fact on constructive notice.

The authority cited by King does not alter this conclusion. In *Rehn v. Westfield America*, 837 A.2d 981 (Md. Ct. Spec. App. 2003), a Chick-fil-A employee at a mall food court had been told of a spilled drink and immediately initiated the process to report it to the mall cleaning personnel, but the accident occurred within four minutes of the spill, before the cleaning crew received notice and arrived on the scene. *Id.* at 983. The court found that although Chick-fil-A had actual notice, its immediate effort to report the hazard constituted reasonable care, and that the mall had not been put on constructive notice because only four minutes had elapsed between the drink spill and the fall. *Id.* at 985–88. Because WMATA had no actual notice of the greasy substance, and *Rehn* does not set any time period after which constructive knowledge would be established, *Rehn* does not advance King's argument.

In *Deering Woods Condominium Association v. Spoon*, 833 A.2d 17 (Md. 2003), also cited by King, the court granted summary judgment against a plaintiff who fell on black ice at a residential condominium complex, even though snow and freezing temperatures gave warning of potentially hazardous conditions, because the condominium association had cleared the snow from the pathway and had not previously had complaints about black ice at that location to warrant additional treatment of the area. *Id.* at 20, 26–28. The court thus found that the association was not on constructive notice of the danger. *Id.* at 26-28. Here, there was nothing, such as snow and cold weather, that arguably put WMATA on notice that there might be a hazard on the escalator.

In summary, the evidence viewed in the light most favorable to King does not support a finding that WMATA created the hazard of a greasy substance on the escalator, or that it had actual or constructive notice of that hazard before King fell. Therefore, King has not shown that

WMATA breached its duty of care to her, and WMATA's Motion for Summary Judgment is granted.

<strong>CONCLUSION</strong>

For the foregoing reasons, WMATA's Motion to Strike is DENIED, and WMATA's Motion for Summary Judgment is GRANTED.  A separate Order shall issue.

Date:  February 26, 2016

THEODORE D. CHUANG
United States District Judge